AO 91 (Rev. 11/11) Criminal Complaint



AUSA Charles W. Mulaney (312) 371-5903

FILED
3/24/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

AGUSTIN ARIAS LOPEZ and
JUAN ARIAS LOPEZ

CASE NUMBER: 1:22-cr-00175

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning in or around June 2021 to and continuing to in or around March 2022, at Chicago, in the

Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 8, United States Code, Section 1324(a)(1)(A)(v)(I) | did conspire to knowingly bring, transport, harbor, and induce aliens to come to, enter, remain in, and reside in the United States |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

_____
ASHLEY KIZLER
Special Agent, Federal Bureau of Investigation
(FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: March 24, 2022

_____
*Judge's signature*

City and state: Chicago, Illinois

SUSAN E. COX, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, ASHLEY KIZLER, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed for ten years.  As part of my duties as an FBI Special Agent, I investigate criminal violations relating to white collar crime, including mail and wire fraud, civil rights offenses, human trafficking, labor trafficking, sex trafficking, and crimes against children.

2.      This affidavit is submitted in support of a criminal complaint alleging that AGUSTIN ARIAS LOPEZ (hereinafter "AGUSTIN ARIAS") and JUAN ARIAS LOPEZ (hereinafter "JUAN ARIAS") has violated Title 18, United States Code, Section 1324(a)(1)(A)(v)(I). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging AGUSTIN ARIAS and JUAN ARIAS with conspiring to knowingly bring, transport, harbor, and induce aliens to come to, enter, remain in, and reside in the United States, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

3.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, my review of pertinent documents and photographs, and interviews of witnesses.

### *Summary of Conspiracy*

4.     In summary, and as set forth in more detail below, beginning in or around June 2021, AGUSTIN ARIAS and JUAN ARIAS conspired to illegally bring in Individuals A and B from Mexico to the United States on the condition that Individuals A and B would agree to work for AGUSTIN ARIAS and JUAN ARIAS and repay AGUSTIN ARIAS and JUAN ARIAS the costs of their illegal transport into the United States. After they arrived in Chicago, Individuals A and B worked for AGUSTIN ARIAS and JUAN ARIAS in construction businesses JUAN and AGUSTIN ARIAS owned and operated. Individuals A and B worked seven days a week, for 12-15 hours a day, in exchange for weekly payments of between approximately $800 and $1,000 from JUAN and AGUSTIN ARIAS. Of that sum, JUAN ARIAS and AGUSTIN ARIAS required Individuals A and B to pay $500 per week towards their debt, as well as money for "rent," which AGUSTIN ARIAS required because he permitted them to reside in AGUSTIN ARIAS's unfinished basement on the 7200 block of South May Street in Chicago (the May Street Property).

5.     In November 2021, AGUSTIN ARIAS fired Individual A from his concrete business and told Individual A that he must pay back his debt plus an additional $5,000. When Individual A and Individual B returned to the May Street

2

Property to collect their belongings, AGUSTIN ARIAS pulled out a handgun and pointed it at Individual A and Individual B. Since then, AGUSTIN ARIAS and JUAN ARIAS have insisted that Individual A and Individual B repay their debt to them for the money AGUSTIN and JUAN ARIAS paid to bring Individuals A and B across the border, illegally, from Mexico to the United States.

### AGUSTIN ARIAS and JUAN ARIAS Recruited Individuals A and B to Work in the U.S. Illegally

6. As detailed below, AGUSTIN ARIAS and JUAN ARIAS arranged for Individual A and Individual B to illegally enter the United States to work for them. Individual A and Individual B provided the following information in their interviews with law enforcement, which were conducted through an interpreter:[1]

### Information Provided by Individual A

7. In his interviews with law enforcement, Individual A provided the following information:[2]

    a. Individual A and Individual B are brothers and both are citizens of Mexico. Individual A was introduced to AGUSTIN ARIAS through a mutual

---

[1] Due to the fact neither Individual A nor Individual B have lawful immigration status to be in the United States, law enforcement agents have submitted applications to the Department of Homeland Security for Continued Presence on behalf of Individuals A and B, so that Individuals A and B may lawfully remain in the U.S. for the duration of this investigation. No promises or payments have been made to Individuals A and B regarding this investigation, but they have been relocated temporarily with government funds to protect their safety based upon AGUSTIN ARIAS's threats with a gun described below.

[2] According to DHS records, Individual A was deported from the United States to Mexico on or about April 16, 2020. In his second interview with law enforcement, Individual A was asked about his previous deportation, and stated that he came to the United States in approximately 2016 and worked in Georgia for three years before being deported.

acquaintance who currently lives in Chicago. When he was living in Mexico, Individual A spoke to AGUSTIN ARIAS by cell phone and accepted an offer from him to come to the United States to work AGUSTIN ARIAS's company, Arias Concrete. AGUSTIN ARIAS told Individual A that he would charge $9,000 to cross the border to the United States. AGUSTIN ARIAS told Individual A to sign a promissory note with another brother, Individual E, for 220,000 pesos, or about $10,703. Pursuant to AGUSTIN ARIAS's instructions to Individual A, Individual A's brother, Individual B, signed over, as collateral to the loan, his titles to plots of land and trucks in Mexico to Individual E, AGUSTIN ARIAS's brother, who lived in Mexico.

b. Individual A understood the terms of the promissory note to be that if he did not pay off his debt in the allotted amount of time set by AGUSTIN ARIAS, then AGUSTIN ARIAS's brother, Individual E, who lived in Mexico, would assign the promissory note to a bank in Mexico, which would charge Individual A an indeterminate amount of interest on the promissory note.

c. Individual A and Individual B began their journey from Mexico to the United States in or before June 2021. Around that time, Individual A was in regular communication with AGUSTIN ARIAS, who was using telephone number 773-###-2784 (Subject Phone 1).[3] In those calls, AGUSTIN ARIAS gave Individual A instructions on how to cross the border, including where to go and the names and

---

[3] According to T-Mobile, this phone number is subscribed in the name of AGUSTIN Arias Lopez at the May Street Property.

4

descriptions of individuals who would take Individual A and Individual B into the United States.[4]

       d.     When Individuals A and B arrived at the border, following AGUSTIN ARIAS's directions, they met with the alien smuggler whom AGUSTIN ARIAS had arranged to bring Individual A and B into the United States. The smuggler instructed Individual A to contact the person who deposited the money to pay him. Individual A contacted AGUSTIN ARIAS via telephone, and AGUSTIN ARIAS told Individual A that that he paid the smuggler 2,000 pesos.[5]

       e.     During their travel across the border, Individual A witnessed another smuggler having a conversation about the trip on his cell phone. Shortly after the smuggler's call ended, Individual A received a phone call from AGUSTIN ARIAS, who told Individual A words to the effect of, "I just spoke to the guy and you're all set."[6]

       f.     Individuals A and B arrived at the May Street Property around June 14, 2021.[7] AGUSTIN ARIAS informed Individual A that in addition to the

---

[4] According to Individual A, the cell phone he was using at this time broke during his trip. Law enforcement has reviewed the phone Individual A obtained after arriving in the United States, which has communications beginning in June 2021.

[5] As of March 2022, the exchange rate for 2000 pesos is approximately $96.

[6] As set forth below, JUAN ARIAS later provided an undercover officer (UC-1) the number 631-144-6856 as a phone number for a "coyote," meaning smuggler. According to T-Mobile records, Subject Phone 1 placed calls to that phone number on June 1, 2021 and June 6, 2021.

[7] This date is corroborated by review of extractions of Individual A and B's cellular phones, which contain text and Whatsapp messages with AGUSTIN ARIAS and JUAN ARIAS, respectively, about payments and work assignments beginning in June 2021.

$9,000 debt he owed, there would be an additional interest charge of $1,500 to be paid.

g.     After Individual A arrived at the May Street Property, AGUSTIN ARIAS offered the basement of the May Street Property as a place where Individual A and Individual B could stay. Individual A described the basement of the May Street Property as unfinished, without walls, a finished ceiling, or a bathroom. Individual A stated that he and Individual B used a bucket for a bathroom for several weeks, and he bathed in a large sink located in the basement of the May Street Property. On one or two occasions, AGUSTIN ARIAS allowed Individuals A and B to enter the first floor of the May Street Property to use the bathroom by exiting the basement and entering the first-floor unit from the outside.[8] AGUSTIN ARIAS lived in the first-floor unit of the building. Between approximately June and October 2021, JUAN ARIAS lived on the second floor of the May Street Property, then moved to a single-family home located on the 5600 block of South Racine Avenue, which also had an adjoining lot used for construction vehicles ("the Racine Avenue Property").

h.     For a period of two to three months, Individual A and Individual B shared a bed in the basement of the May Street Property. After two or three months, AGUSTIN ARIAS offered to sell a bed to Individual A for $400, which Individual A accepted.

---

[8] Individuals A and B stated that the basement doors initially had no locks, but they later installed a lock on the front basement door which they had a key to.

i. The day after Individual A arrived at the May Street Property, AGUSTIN ARIAS drove Individual A to work laying concrete at a job site. Individual A described AGUSTIN ARIAS's vehicle as a red Ford F-150 pick-up truck (Subject Vehicle 1).[9] On the side of Subject Vehicle 1 were signs for AGUSTIN ARIAS's business, "Arias Concrete." AGUSTIN ARIAS kept a ledger in the dashboard area of Subject Vehicle 1 and used it to record Individual A's payments and other transactions for the business.

j. Individual A worked seven days a week, and each workday began at approximately 6:00 a.m. The end of the workday was somewhere between 6:00 p.m. to 9:00 p.m. AGUSTIN ARIAS paid Individual A anywhere from $800 to $1,000 per week for his work via a personal check. After AGUSTIN ARIAS paid Individual A by check, Individual A took his paycheck to a local currency exchange to cash the check. Individual A showed his birth certificate and had a coworker attest to his identity to cash the check because Individual A had no other form of identification.

k. While working in the United States, Individual A continued to communicate with AGUSTIN ARIAS at Subject Phone 1. Individual A showed agents text messages between himself and Subject Phone 1, which was identified by phone number. In those messages, based upon Spanish speaking translator, AGUSTIN ARIAS provided work site location information and job information, including

---

[9] Agents showed Individual A a stock photo of a red Ford F250, which matches the model for Subject Vehicle 1, and Individual A identified that vehicle as the type of red Ford pickup he was referring to. According to a law enforcement database, AGUSTIN ARIAS has 15 vehicles registered in his name or business name, including a red Ford F-250 that is registered to the May Street Property.

addresses, and tasks to be completed to Individual A. AGUSTIN ARIAS also used the Whatsapp application to send Individual A similar instructions over text and audio voice recordings. Individual A sent AGUSTIN ARIAS photographs of job sites over text message and Whatsapp.[10]

l.      After cashing his paycheck, Individual A made payments in amounts of approximately $500 at a time to AGUSTIN ARIAS to pay off Individual A's debt and avoid the financial consequences of potentially defaulting on the promissory note. Individual A saw AGUSTIN ARIAS note his payments in a blue notebook, which AGUSTIN ARIAS kept in Subject Vehicle 1. AGUSTIN ARIAS also maintained records of job sites and individuals working for him in the notebook. At one point, Individual A asked AGUSTIN ARIAS if Individual A could take a picture of the notebook to keep track of how much he already paid towards his debt, but AGUSTIN ARIAS refused to allow him to do so.

m.      In addition to collecting Individual A's debt for crossing the border, AGUSTIN ARIAS charged Individuals A and B rent in the amount of $250 to $300 each per month in exchange for AGUSTIN ARIAS allowing Individuals A and B to live in the unfinished basement below AGUSTIN ARIAS's first-floor unit at the May Street Property. As discussed above, the basement lacked a bathroom. On a few occasions, AGUSTIN ARIAS brought Individual A and B food for dinner in the

---

[10] In his interview, Individual A showed examples of these messages to a Spanish speaking-agent, and those messages are summarized in this paragraph. The above descriptions are based on a preliminary, and not final, review of the messages in Individual A's phone. Based on this preliminary review, it appears that the messages included work instructions and communications nearly every day between June and November 2021.

basement. After several weeks of living in the basement of the May Street Property, AGUSTIN ARIAS provided building materials to Individual A and Individual B to install a bathroom in the basement, and walls to divide rooms. During their last month in the basement of the May Street Property, another employee of AGUSTIN ARIAS, Individual D, lived in the basement with Individuals A and B.

n.     During the time that Individual A and Individual B worked for AGUSTIN ARIAS, AGUSTIN ARIAS was "very aggressive" towards Individual A. AGUSTIN ARIAS bragged about the guns he owned and yelled at Individual A and other workers on job sites.

o.     On or about November 30, 2021, AGUSTIN ARIAS fired Individual A for not completing a task to AGUSTIN ARIAS's satisfaction at a job site. AGUSTIN ARIAS ordered Individual A to leave the job and told him he could no longer live at the May Street Property. When Individual A asked if he could go to the May Street Property to retrieve his property, AGUSTIN ARIAS instructed Individual A to come alone. Individual A did not want to go to the May Street Property alone due to AGUSTIN ARIAS's aggressive nature and frequent statements about owning guns. Individual A asked Individual B to come to the May Street Property to retrieve their belongings, and they returned there together. While Individual A and B gathered their belongings, AGUSTIN ARIAS told Individual A that he owed $2,700 towards the debt and that AGUSTIN ARIAS would be adding on additional amount of $5,000 to the debt. AGUSTIN ARIAS told Individual A that he expected payments towards this debt in monthly payments of $300, with interest.

p.     While Individual A and Individual B were leaving the May Street Property, Individual B got in a verbal altercation with AGUSTIN ARIAS and told AGUSTIN ARIAS that he was taking advantage of them. AGUSTIN ARIAS pulled a gun out and pointed it at Individual A and Individual B. Individual D intervened to stop the altercation. Individual A and Individual B left and reported the incident to the Chicago police.[11]

q.     On February 4, 2022, Individual A was walking outside of his new residence when AGUSTIN ARIAS pulled up in a gray pickup truck (Subject Vehicle 2). AGUSTIN ARIAS exited the vehicle and demanded that Individual A pay money that he owed him. When Individual A began to explain that he needed more time to come up with the money, AGUSTIN ARIAS told Individual A words to the effect of "figure it out quickly" and that AGUSTIN ARIAS planned on getting the money "por las buenas o por las malas," which, according to an FBI translator certified in Spanish language translation, translates to "for good or for bad," and which Individual A understood to mean "the easy way or the hard way."

### *Information Provided by Individual B*

8.     In his interviews with law enforcement, Individual B provided the following information:

a.     Individual B is a citizen of Mexico and the brother of Individual A. Individual A had phone calls with AGUSTIN ARIAS before they crossed the border

---

[11] Individual A's account is corroborated by a report completed by Chicago Police Officers who took A's complaint. Because the FBI became involved shortly after this incident, the police never interviewed AGUSTIN ARIAS about the incident.

to Mexico. Individual A told Individual B that AGUSTIN ARIAS quoted the amount of $9,500 for Individual B to come to the United States. Individual B overheard Individual A on the phone with AGUSTIN ARIAS when this price was proposed by AGUSTIN ARIAS. Based on AGUSTIN ARIAS's instruction relayed by Individual A, Individual B signed over two plots of land which were worth approximately 140,000 pesos, or approximately $6,864, to Individual E, as a collateral to the promissory note for the amount that AGUSTIN ARIAS quoted to come to the United States.

b.      Individual A and Individual B crossed the border into Nogales, Arizona with the help of a smuggler and continued their journey to Chicago. When Individual A and Individual B arrived at the May Street Property, AGUSTIN ARIAS told Individual B that if he did not pay off the full loan amount in eight months, then Individual B would be charged with a significant interest rate.

c.      After arriving at the May Street Property, AGUSTIN ARIAS had a meeting with Individual A and Individual B. AGUSTIN ARIAS informed Individual B that in addition to the $9,500 debt he already owed, Individual B owed AGUSTIN ARIAS an additional $1,500 in interest. AGUSTIN ARIAS also told Individual B that he would be working for JUAN ARIAS at his company called "PA Concrete." AGUSTIN ARIAS instructed Individual B to pay off his debt to JUAN ARIAS.

d.      After this initial meeting, Individual B worked for JUAN ARIAS seven days a week starting at approximately 6:00 a.m. and typically ending between 6:00 p.m. to 9:00 p.m. In or around October 2021, JUAN ARIAS moved to the Racine Avenue Property, and Individual B began reporting there each morning for work.

JUAN ARIAS paid Individual B approximately $800 in cash every week. Individual B paid JUAN ARIAS between approximately $300 and $600 towards his debt each week.

e.  JUAN ARIAS provided Individual B with a cellular phone. Individual B had to pay JUAN ARIAS $55 per month to cover the cost of the cell phone service. JUAN ARIAS told Individual B that it would be easier to send him addresses for work through this phone.[12]

f.  Each time Individual B paid money towards his debt, Individual B sent a text message to JUAN ARIAS's cellular phone, 872-###-0157 (Subject Phone 2), confirming that Individual B made a payment.[13]

g.  On or about November 30, 2021, Individual B received a phone call from Individual A. Individual A told Individual B that he had been fired and that AGUSTIN ARIAS told Individual A to come get his things from the May Street Property alone. Individual B was worried about Individual A because he had previously observed AGUSTIN ARIAS's aggressive nature and talk of owning guns. Individual B called AGUSTIN ARIAS at the number for Subject Phone 1, to discuss collecting their belongings from the May Street Property.

---

[12] Agents reviewed text messages from Subject Phone 2 on Individual B's phone, which include a series of addresses during this time period.

[13] According to a Spanish speaking agent who reviewed extracted text messages from Individual B's phone from June 2021 date to October 2021, Individual B sent about two messages a month to Subject Phone 2 which stated, in summary, amounts of money between $400 and $700.

h.     Individual B called JUAN ARIAS using the number for Subject Phone 2 to say that he would not be working for JUAN ARIAS any longer because AGUSTIN ARIAS fired Individual A.[14] JUAN ARIAS told Individual B that starting December 1, 2021, Individual B would be charged interest on his remaining debt of $5,900 in the amount of 60,000 pesos, or approximately $2,877.60.

i.     As Individual B was leaving the May Street Property, he told AGUSTIN ARIAS that he believed AGUSTIN ARIAS was "taking advantage" of him and Individual A. AGUSTIN ARIAS became very angry and pulled out a gun and pointed it at Individual B and Individual A. Individual B believed AGUSTIN ARIAS was going to shoot him and Individual A. Individual D intervened, and Individual B was able to leave the May Street Property.

j.     On or about December 1, 2021, Individual B received a text message from Subject Phone 2 which was translated by a Spanish speaking agent and an FBI linguist as follows:

> Today is the start of the first month.  I expect the interest on the 1st of January.  It will be $600.  I don't want to have any difficulties or have the need to go find you.

k.     A few weeks after the text message was sent, Individual B learned that his brother in Mexico, Individual C, was receiving Whatsapp messages from Individual E, AGUSTIN ARIAS's brother in Mexico. Individual E explained to Individual C that Individuals A and B were not making payments towards their

---

[14] According to T-Mobile, on November 30, 2021 Individual B's phone placed two outgoing calls to Subject Phone 2 and received one incoming.

smuggling debts. Individual C then offered an additional plot of family land that was estimated to be worth approximately $5,000. Individual E accepted the offer on behalf of AGUSTIN ARIAS and they signed the appropriate paperwork.

### Meetings with JUAN ARIAS

9.      As discussed in more detail below, on February 9, 2022, and February 23, 2022, undercover officers (UC-1 and UC-2) met with JUAN ARIAS in person under the pretense that UC-1 was Individual A and Individual B's new employer who was going to serve as an intermediary to pay off their debts. During the second meeting, JUAN ARIAS called AGUSTIN ARIAS and UC-1 had a conversation with AGUSTIN ARIAS on speaker phone in JUAN ARIAS's presence, in which AGUSTIN ARIAS confirmed that Individuals A and B owed him money. Earlier in the conversation, JUAN ARIAS confirmed that AGUSTIN had threatened Individuals A and B with a firearm.

### February 9, 2022 Meeting

10.      On or about February 9, 2022, Individual B sent text messages to Subject Phone 2 to arrange a meeting between JUAN ARIAS and UC-1.[15] UC-1 then made a recorded call to Subject Phone 2 and a voice later identified as [16]JUAN ARIAS's answered and they discussed a meeting in the area of Supermarket A. Later that day, UC-1 and UC-2, equipped with covert video and audio recording devices,

---

[15] Law enforcement preserved all text messages in connection with these meetings and the full meetings were audio and video recorded. The summary is a preliminary translation and transcription based on a debriefing of UC-1 and UC-2.

[16] JUAN ARIAS' voice was identified as the user of Subject Phone 2 after JUAN ARIAS met with agents later that day.

arrived at Supermarket A, parked in the parking lot of Supermarket A, and sent a message to Subject Phone 2. JUAN ARIAS arrived at Supermarket A at approximately 12:39 p.m. in a Chevrolet pick-up truck, IL plate 3201702 (Subject Vehicle 17), registered to the name Juan Arias Lopez at the May Street Property.[17] The name P.A. Concrete was imprinted on the side of the vehicle.

11.     During the meeting, UC-1 gave JUAN ARIAS $600 and stated that $300 was for JUAN ARIAS, and $300 was for JUAN ARIAS's brother, meaning AGUSTIN ARIAS. JUAN ARIAS and CI-1 had the following conversation, in summary.[18] After UC-1 provided $600 to JUAN ARIAS, UC-1 asked JUAN ARIAS if he was going to note this payment down anywhere, to which JUAN ARIAS responded, "I have it [the records of the debt] at the house, if you want, I'll send you a photo." JUAN ARIAS referred to an initial agreement "for the passage" under which Individual B still had to pay JUAN ARIAS the debt that he owed him. JUAN ARIAS told UC-1 that Individuals A and B moved out of the May Street Property and have not paid towards their debt since December 1, 2021. JUAN ARIAS said that he and AGUSTIN ARIAS "are charging [Individuals A and B] because the family has land." When asked how much Individual A owes, JUAN ARIAS responded "120,000 pesos, [or approximately] $6,000 dollars and this one [Individual B] owed me 132,000 [pesos] but with the land,

---

[17] JUAN ARIAS was also identified through a comparison to the photo in his Department of Homeland Security immigration file.

[18] The following summary of JUAN ARIAS's statements is based on a preliminary translation and consultation with UC-1 and UC-2, who both participated in the conversation. Both UC-1 and UC-2 have training and experience in matters involving immigration and Mexican drug cartel criminal activity. During the meeting, UC-1 referred to Individual A by a variation on his first name and to Individual B by his first name.

Individual B would owe me 32,000 pesos." JUAN ARIAS further stated that he had covered the cost of Individual B's clothes and rent. JUAN ARIAS explained that Individual B started out paying him $600 per month but then it trickled down to $100 and sometimes nothing.

12.    JUAN ARIAS further explained to UC-1 that he only charged Individual B an additional $2,300 and stated, "to be honest, the problem is not with [Individual B] but [Individual A] with my brother [AGUSTIN ARIAS]." JUAN ARIAS stated that he and his brother have known Individual B and his brothers since they were kids.

13.    Later in the conversation, UC-1 asked JUAN ARIAS if something bad happened between Individuals A and B and AGUSTIN ARIAS. JUAN ARIAS responded that Individuals A and B got in an argument with AGUSTIN ARIAS over the payments, and AGUSTIN ARIAS "took out the fucking gun and they all got quiet, scared [AGUSTIN ARIAS] said, they even turned pale, [AGUSTIN ARIAS] said."

*February 23, 2022, Meeting*

14.    On February 23, 2022, at approximately 1:45 p.m., UC-1 sent text messages to Subject Phone 2 to set up a meeting at a parking lot of an auto repair shop on the south side of Chicago ("Parking Lot B"). UC-1 and UC-2 arrived in Parking Lot B at approximately 2:48 p.m., equipped with audio and video recording devices. At approximately 3:32 p.m., JUAN ARIAS arrived in a 2018 gray Nissan, IL plate CX85483, registered in the name Juan Arias Lopez (Subject Vehicle 16).

15.    UC-1 and UC-2 met JUAN ARIAS outside their vehicles. During that meeting, JUAN ARIAS stated that [Individual B] still owed him 5,200 pesos, or

approximately $260. UC-1 handed over a total of $2,000 cash to JUAN ARIAS. JUAN ARIAS counted the money and stated, "That's $260 [the remaining balance owed by Individual B], and now he [Individual B] is done with me." UC-1 interpreted that to mean that $260 of the $2,000 would go towards Individual B's debt, while the remainder could be applied to Individual A's debt to AGUSTIN ARIAS. JUAN ARIAS further stated "now I just need to give him [Individual B] the papers for his land, he gave me another one. Now I am just waiting for them to go sign in Mexico so then they can be mine and then we are done." Based on my interviews with Individuals A and B, and UC-1's understanding of the conversation, I interpret this to mean that JUAN ARIAS gave Individual B legal documents to transfer Individual A and B's family land in Mexico to JUAN ARIAS, to satisfy Individual B's debt.

16. During the meet, UC-1 asked JUAN ARIAS if he knew anyone who could help "over there with the jump," meaning border crossing.[19] JUAN ARIAS told the UC-1, "if you want, I can give you the number of one of the guys and then when they call you explain how you have someone." The UC-1 asked which border crossing would be closer to Agua Prieta in Mexico. JUAN ARIAS responded, "it would probably be Sonora [at the Arizona-Mexico border] and that's like 10 hours, but the man who crossed these guys [Individuals A and B], I see that he does his job, and I can send you the number." JUAN ARIAS provided phone number 631-###-2938 to the UC-1 and stated that the number was for the "coyote," meaning a smuggler. UC-1 asked if this was the same person who assisted Individuals A and B across the border, and

_____

[19] According to UC-1, "brinco," meaning "jump," is a slang term used for border crossing.

JUAN ARIAS responded, "yes." JUAN ARIAS then provided phone number 631-###-6856, for "Jesus" and said it was "the same guy," which UC-1 understood to mean that it was an alternate number for the same smuggler.[20] JUAN ARIAS then provided the phone number 773-###-2784 (Subject Phone 1) for AGUSTIN ARIAS.

17.     During the meeting, JUAN ARIAS called AGUSTIN ARIAS and put AGUSTIN ARIAS on speakerphone with UC-1. UC-1 asked how much debt Individual A owed AGUSTIN ARIAS, and AGUSTIN ARIAS responded,[21] "[Individual A] owed me $6,000 plus the interest minus the $300 [UC-1] gave me [through JUAN ARIAS in the previous meeting] so we can deduct the $1,700 [paid during this meet] from that." AGUSTIN ARIAS also stated, "I'll make a note so [Individuals A and B] can see the totals … [Individuals A and B] have cars here [in the U.S.] and in Mexico in which they work with and I have their papers, but if they don't want to pay, I'll take it [their property] away." Based on Individual A and B's statements, I interpret this to mean that AGUSTIN ARIAS was stating that he would take away Individual A and B's property if they did not pay, which includes cars in the United States and land in Mexico. AGUSTIN ARIAS further stated that Individuals A and B "owe [AGUSTIN ARIAS] $6,000 minus $1,740 for a total of $4,260 and if they don't pay it at the end of the month it will go up with the interest."

---

[20] According to toll records, between February 25, 2021, and March 28, 2021, there were approximately fourteen calls between Subject Phone 2 and the 631-###-6856 number that JUAN ARIAS provided.

[21] According to the agent who interviewed AGUSTIN ARIAS and listened to the recording, it appears to be his voice in the recorded phone call.

### *Operation of Construction Businesses*

18.     As noted above, AGUSTIN ARIAS and JUAN ARIAS operated concrete businesses out of the May Street Property and Racine Avenue Property during the time that Individual A and B worked for them. Based on the surveillance described below, and the evidence obtained during execution of search warrants on those properties earlier on March 24, 2022, AGUSTIN ARIAS was living at the May Street Property and JUAN ARIAS was living at the Racine Avenue Property.

### *May Street Property*

19.     Law enforcement agents conducted video surveillance of the May Street Property on March 1, 14, 15, and 16, 2022, and observed that the adjacent lot next to the May Street Property is surrounded by an eight-foot privacy fence, with an access gate located in the alleyway. Agents also observed several construction vehicles entering and exiting the rear gate to the fenced in lot. Several individuals were seen arriving at the adjacent lot next to the May Street Property during weekdays between the hours of approximately 6:00 a.m. and 7:00 a.m. The vehicles entered the vacant lot, loaded various construction vehicles and equipment onto trailers, then departed the May Street Property.

20.     For example, on March 1, 2022, at approximately 5:57 a.m., four to five individuals arrived near the alley behind the May Street Property. The gate to the surrounding fence located at the May Street Property opened into the alleyway. At approximately 6:12 a.m., individuals began driving construction trucks out of the

back gate and into the alleyway. At approximately 6:39 a.m., additional individuals left the lot in construction vehicles.

21.     At approximately 7:42 a.m., an individual matching the description of AGUSTIN ARIAS exited a red GMC pick-up truck (Subject Vehicle 3) and locked the back gate of the lot.[22]  The truck had business decals located on the driver's side and passenger side doors.

*Racine Avenue Property*

22.     Before the undercover meeting on or about February 23, 2022, when UC-1 was arranging a place to meet, JUAN ARIAS stated that he resided near 56th and Racine, which is the approximate location of the Racine Avenue Property.

23.     On or about March 3, 2022, law enforcement conducted surveillance of the Racine Avenue Property. Adjacent to the house was a large fenced in area. Construction-style vehicles were visible from just over the top of the fence. There was a large sign affixed the fence that read, in Spanish, "Looking for people to work in concrete. With or without experience. For more information call 872-###-0157." The phone number on the sign is the number for Subject Phone 2, which is partially redacted.

---

[22] The Illinois license plate on the vehicle was registered to AGUSTIN Arias Lopez at an address on the 7200 block of South Marshfield, Chicago. According to police reports, the Marshfield Address is where AGUSTIN ARIAS was arrested in 2019 for aggravated discharge of a firearm.



*Surveillance on March 14, 2022*

24.     On March 14, 2022, agents conducted surveillance of the Racine Avenue Property and observed approximately four to five individuals arriving at the Racine Avenue Property at approximately 6:06 a.m. The individuals drove vehicles through a large gate located in the front of the Racine Avenue Property. Approximately 10 minutes later, the individuals exited the Racine Avenue Property in white utility trucks. At approximately 7:02 a.m., an individual matching the description of JUAN ARIAS exited in a red full-size truck and locked the fence before departing the premises.

25.     On March 16, 2022, agents conducted surveillance of the Racine Avenue Property. At approximately 6:06 a.m., agents observed approximately four individuals arrive and enter the main gate entrance located off Racine Avenue. At approximately 6:15 a.m., agents observed an individual matching the description of

JUAN ARIAS lean out of a back window in the Racine Avenue Property and speak with the individuals standing in the adjacent lot.

26. As described above, law enforcement has observed multiple vehicles at the May Street Property and the Racine Avenue Property, including commercial trucks used for construction. AGUSTIN ARIAS and JUAN ARIAS have approximately 23 vehicles registered to their names and "Arias Concrete" or "PA Concrete LLC," including trucks.[23] The large number of vehicles, and surveillance described above, indicates that they use multiple workers for their construction jobs.

### *Execution of Search Warrants*

27. At approximately 7:05 a.m. and 6:30 a.m. on March 24, 2022, agents executed federal search warrants at the May Street and Racine Avenue Properties, respectively. AGUSTIN ARIAS was seen by surveillance departing the May Street Property and was stopped by law enforcement near 69th and Racine at 6:19 a.m., when he was taken into custody. Before executing the search warrant, law enforcement conducting surveillance observed six individuals arrive at the Racine Avenue property in vehicles and a bicycle. When agents entered the property, the six individuals were found in the adjacent lot, where construction-type vehicles were located. JUAN ARIAS came out of the house to the front of the Racine Avenue Property when agents arrived.

---

[23] Approximately 13 of these vehicles are registered to either the May Street or Racine Avenue Properties.

*Ledgers of Debts*

28. During the execution of the search warrant, agents recovered ledgers that appeared to be from the same notebooks that Individuals A and B described as used by AGUSTIN and JUAN ARIAS to record their debts.

29. According to Individual B, after arriving in Chicago, he asked AGUSTIN ARIAS, in JUAN ARIAS's presence, if he could take photos of AGUSTIN ARIAS and JUAN ARIAS's notebooks, where they kept records of Individual A and B's debt, respectively. Individual B explained that he wanted to keep track of what was owed. Individual B was allowed to take the pictures. Agents recovered the following photos from Individual B's phone, dated June 21, 2021, and June 29, 2021, which show ledgers bearing Individual A and Individual B's names and the word "pasada," meaning passage.[24] According Individual A, the amounts at the bottom left corner of the page are debts that other workers owed AGUSTIN ARIAS, and the amounts are in U.S. dollars:[25]

---

[24] Individual A and B's names have been redacted from the final affidavit to protect their privacy and safety.

[25] Individual A and B's names have been redacted from the publicly filed affidavit to protect their privacy and safety.



30.     During the execution of the search warrant on the May Street Property on March 24, 2022, agents recovered a notebook from the backseat of a red GMC Sierra pickup truck with license plate 2757992B, which is registered to AGUSTIN ARIAS.  The notebook appeared to contain the same page as the notebook on the left, with additional writing on it. During the execution of the search warrant on the Racine Street Property, agents recovered a notebook from the kitchen counter that appeared to contain the same page as the notebook on the left, with additional writing on it. The evidence from the May Street Property and Racine Avenue Property are shown below on the left and right, respectively:



*Firearms and Other Evidence Recovered*

31.     During the execution of the search warrants, law enforcement recovered firearms from both locations.

32.     At the Racine Avenue Property, law enforcement recovered a rifle from the rafters of the attic space.

33.     From the May Street Property, law enforcement recovered a Colt 45 handgun and an assault rifle. The assault rifle is shown below:



34.     AGUSTIN ARIAS was interviewed by FBI agents following his arrest with the aid of a Spanish agent/translator. After being provided with *Miranda* warnings, AGUSTIN ARIAS agreed to orally waive his *Miranda* rights and speak with agents. After being asked about firearms, AGUSTIN ARIAS stated that there were two firearms in the house and told the agents where they could find them. The Colt handgun was found in a bedroom underwear drawer in a room that AGUSTIN ARIAS identified as "my underwear drawer." The rifle was found in a tool room in the basement under a blanket. AGUSTIN ARIAS admitted that both firearms were his.

35.     Agents also found two individuals in the basement of the May Street Property. In his interview with law enforcement, AGUSTIN ARIAS stated that there were two individuals living in the basement of the May Street Property.

## *Conclusion*

36.     Based on the foregoing, I respectfully submit there is probable cause to believe that beginning in or around June 2021, and continuing to in or around March 2022, defendants AGUSTIN ARIAS and JUAN ARIAS conspired to knowingly bring, transport, harbor, and induce aliens to come to, enter, remain in, and reside in the United States, in violation of Title 8, United States Code, Section 1324(a) (1)(A)(v)(I).

FURTHER AFFIANT SAYETH NOT.

ASHLEY KIZLER
Special     Agent,     Federal     Bureau     of
Investigation

SWORN TO AND AFFIRMED by telephone on March 24, 2022.

Honorable SUSAN E. COX
United States Magistrate Judge

27